JOON SONG (SBN: 281391)
jsong@lfbrown.law
JOYCE H. MA (SBN: 274140)
jma@lfbrown.law
JEREMY WANG (SBN: 326319)
jwang@lfbrown.law
**L&F BROWN, P.C.**
6430 Sunset Blvd., Suite 505
Los Angeles, CA 90028
Tel: (213) 928-1556
Fax: (323) 372-3988

*Attorneys for Plaintiffs JUSTINE SINCLAIR
and DREAMOWAY, INC.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTINE SINCLAIR, an individual; DREAMOWAY, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>AGILE WEB STUDIOS, a business entity of unknown origin; DYNAMIC DIGITAL SOLUTIONS, LLC, a Virginia limited liability company; VTLOGODESIGN, INC., a Florida corporation; ONE STOP COMPUTER SERVICES LLC, a Virginia limited liability company; RFK TECHNOLOGIES LTD., a United Kingdom limited company; TYLER SCOTT, an individual; ALEX MARTIN, an individual; and DOES 1 through 100, inclusive, | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF WRITTEN CONTRACT**<br>2. **BREACH OF ORAL CONTRACT**<br>3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4. **FRAUD**<br>5. **THEFT**<br>6. **UNLAWFUL BUSINESS PRACTICES**<br>7. **UNJUST ENRICHMENT**<br>8. **DECLARATORY RELIEF**<br><br>**AND DEMAND FOR JURY TRIAL** |

1

**Complaint**

Defendants.

Plaintiffs JUSTINE SINCLAIR and DREAMOWAY, INC. hereby allege as follows:

**PARTIES**

1.    Plaintiff JUSTINE SINCLAIR ("SINCLAIR") is an individual. She is a resident of the State of Texas and the County of Travis.

2.    Plaintiff DREAMOWAY, INC. (collectively with SINCLAIR, "Plaintiffs") is a Delaware corporation with its principal place of business located at 1201 North Market St., Suite 111, Wilmington, Delaware 19801.

3.    Plaintiffs are informed and believe and thereon allege that Defendant AGILE WEB STUDIOS ("AGILE") is a business entity with its principal place of business located at 2033 Gateway Place North, 5th Floor, San Jose, CA 95110 in Santa Clara County.

4.    Plaintiffs are informed and believe and thereon allege that Defendant DYNAMIC DIGITAL SOLUTIONS, LLC ("DDS") is a Virginia limited liability company with its principal place of business located at 44075 Pipeline Plz Ste 215, Ashburn, VA 20147.

5.    Plaintiffs are informed and believe and thereon allege that Defendant VTLOGODESIGN, INC. ("VT") is a Florida corporation with its principal place of business located at 1317 Edgewater Dr Ste 156, Orlando, FL 32804.

6.    Plaintiffs are informed and believe and thereon allege that Defendant ONE STOP COMPUTER SERVICES LLC ("OSCS") is a Virginia limited liability company with its principal place of business located at 44110 Saxony Terrace, Ashburn, VA 20147.

///

**Complaint**

7.     Plaintiffs are informed and believe and thereon allege that Defendant RFK TECHNOLOGIES LTD. ("RFK") is a United Kingdom limited company with its principal place of business located at 20-22 Wenlock Road, London, United Kingdom, N1 7GU.

8.     Plaintiffs are informed and believe and thereon allege that Defendant TYLER SCOTT ("SCOTT") is an individual residing in Santa Clara County, California. SCOTT has identified himself to Plaintiffs as the Senior Vice President of AGILE. Plaintiffs are informed and believe that SCOTT is a principal, officer, and director of AGILE, DDS, VT, OSCS, and RFK.

9.     Plaintiffs are informed and believe and thereon allege that Defendant ALEX MARTIN ("MARTIN") is an individual residing in Santa Clara County, California. MARTIN has identified himself to Plaintiffs as an Associate Vice President of AGILE. Plaintiffs are informed and believe that MARTIN is an officer and director of AGILE, DDS, VT, OSCS, and RFK.

10.     Plaintiffs are informed and believe and thereon allege that Defendant DOE 1 is an individual associated with AGILE, DDS, VT, OSCS, and RFK using the alias "FRANK S." Plaintiffs do not have sufficient knowledge to allege the residence of Defendant DOE 1. Plaintiffs will amend this complaint to state the true name, capacity, and residence of Defendant DOE 1 when they are ascertained.

11.     Plaintiffs do not know the true names and capacities of Defendants DOES 2-100, inclusive, but alleges that these Defendants are responsible in some manner for the acts, omissions, incidents, transactions, and/or events alleged herein, and Plaintiffs therefore sue each of them by such fictitious names. Plaintiffs will amend this complaint to state the true names and capacities of said Defendants when they are ascertained.

///

**Complaint**

12.    At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendants' acts alleged herein was done with the permission and consent of each of the other Defendants.

13.    At all times relevant hereto, Defendants AGILE, DDS, VT, OSCS, and RFK were the alter egos of each other and of Defendants SCOTT and MARTIN, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between the Defendants such that any separateness between them has ceased to exist in that each Defendant completely controlled, dominated, managed, and operated Defendants AGILE, DDS, VT, OSCS, and RFK to suit their convenience.

14.    Specifically, at all times relevant hereto, each Defendant (1) controlled the business and affairs of Defendants AGILE, DDS, VT, OSCS, and RFK, including any and all of their affiliates; (2) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets for their own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (4) inadequately capitalized Defendants AGILE, DDS, VT, OSCS, and RFK; (5) held themselves out as personally liable for the debts of the corporate entities; (6) used the corporate entities as mere shells, instrumentalities or conduits for themselves and/or their individual businesses; (7) used the corporate entities to procure labor, services or merchandise for another person or entities; (8) used corporate entities to conceal their ownership, management and financial interests and/or personal business activities; and (9) used the corporate entities to shield against personal obligations, and in particular the

obligations as alleged in this Cross-Complaint.

15.     At all times relevant thereto, Defendants AGILE, DDS, VT, OSCS, and RFK were not only influenced and governed by each other and the other Defendants, but there was such a unity of interest and ownership that the individuality, or separateness, of Defendants AGILE, DDS, VT, OSCS, and RFK has ceased, and that the facts are such that an adherence to the fiction of the separate existence of these entities would, under the circumstances, sanction a fraud or promote injustice.

## JURISDICTION

16.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 (diversity of citizenship). Plaintiff and Defendants are citizens of different states because Plaintiffs are citizens of Texas and Delaware, while Defendants are citizens of California, Virginia, Florida, and the United Kingdom. The amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to the causes of action alleged herein occurred in the County of Santa Clara, which is within the Northern District of California.

## DIVISIONAL ASSIGNMENT

18.     This action should be assigned to the San Jose Division of this Court pursuant to Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to the causes of action alleged herein occurred in the County of Santa Clara, which is within the San Jose Division of this Court.

///

///

**Complaint**

## FACTS

**A. HUNTGEM**

19.    In or about August 2022, SINCLAIR started an ecommerce business named HUNTGEM to sell clothing and other fashion products through an online store. SINCLAIR began to search Google for resources to create an online ecommerce store in line with a mock-up website she created for HUNTGEM , where she located the contact information for DOE 1, who posed as an "official Shopify partner" by the name of "FRANK S." ("Shopify" is a proprietary e-commerce platform for online stores and retail point-of-sale systems.)

20.    SINCLAIR contacted DOE 1 to discuss creating the HUNTGEM online store as a website built on the Shopify ecommerce platform. During their conversation, DOE 1 represented to SINCLAIR that (1) he was an "official Shopify partner" by the name of "FRANK S," (2) that SINCLAIR could only create a website on the Shopify platform through third-party "partners" such as himself, and (3) that his affiliate company AGILE could create a fully-functioning online store for HUNTGEM to SINCLAIR's specifications in exchange for a one-time payment of $550. All these representations were false when they were made, and DOE 1 knew that they were false, but DOE 1 intended to persuade SINCLAIR to pay him the $550 through these false representations.

21.    SINCLAIR reasonably relied upon these representations and entered into an oral contract with Defendants to pay $550 in exchange for the aforementioned services (the "First HUNTGEM Contract"). SINCLAIR concurrently paid $550 to Defendants pursuant to this contract.

22.    DOE 1 accepted the $550, then introduced SINCLAIR to MARTIN and AGILE, informing SINCLAIR that AGILE would take on the responsibility of completing

6

**Complaint**

the website for HUNTGEM.

23.    On or about August 16, 2022, MARTIN contacted SINCLAIR. During their conversation, MARTIN represented to SINCLAIR that AGILE was a full-service e-commerce support company, with 330 developers and 33 lawyers, and that AGILE would be able to handle all aspects of HUNTGEM's formation and operations on behalf of SINCLAIR, including formation of the appropriate business entity, copyright registrations for HUNTGEM's intellectual property, social media marketing of HUNTGEM's products, and management of customer orders placed through HUNTGEM's online store. MARTIN recommended to SINCLAR that she hire AGILE to create an online store for HUNTGEM from scratch, rather than using the Shopify platform, in order to avoid Shopify commissions and fees.  MARTIN told SINCLAIR represented that, from their expertise, Shopify will not be profitable, and the only profitable option was to create a drop shipping operation. MARTIN told SINCLAIR that AGILE's average e-commerce drop shipping website customers earned between $5,000 to $10,000 in net profit every month. All these representations were false when they were made, and MARTIN and AGILE knew that they were false, but they intended to persuade SINCLAIR to pay them money through these false representations.

24.    MARTIN also assured SINCLAIR that she would be protected by a "100% Satisfaction Guarantee" and a "100% Money Back Guarantee" with respect to AGILE's services for the HUNTGEM website. Indeed, as of the filing of this Complaint, AGILE's website still reflects that all its Shopify and E-Commerce packages are fully guaranteed in those respects.

25.    SINCLAIR reasonably relied upon these representations and entered into an oral contract with Defendants to pay $2,648 in exchange for the aforementioned services

**Complaint**

(the "Second HUNTGEM Contract"). SINCLAIR concurrently paid $2,648 to Defendants pursuant to this contract.

26.    Defendants also retained SINCLAIR's initial $550 payment, representing to SINCLAIR that the $550 would serve as a "speed service fee" in exchange for delivery of the fully completed and fully functioning HUNTGEM website within (2) two weeks.

27.    On or about August 31, 2022, SCOTT falsely represented to SINCLAIR that the HUNTGEM website was nearly complete. SCOTT and other AGILE employees told SINCLAIR that HUNTGEM would require aggressive marketing to achieve profitable sales. AGILE requested SINCLAIR pay an additional sum of approximately $2,500 for the HUNTGEM website on or about August 31, 2022, to finance marketing efforts through social media accounts, social media campaigns, search engine optimization, Google Business, Google Maps, and Google Analytics.

28.    SINCLAIR reasonably relied upon these representations and executed a written agreement for 6 months of "Search Engine Optimization" and "Social Media Management" with Defendants (the "HUNTGEM Marketing Contract"). She concurrently paid Defendants $2,500 pursuant to that agreement.

29.    Ultimately, Defendants failed to deliver the HUNTGEM website by the specified deadline and has yet to deliver the HUNTGEM website at all.  They failed to obtain copyright registrations for HUNTGEM's intellectual property. They failed to incorporate HUNTGEM as agreed upon.

30.    In fact, Defendants did not fulfill any of their obligations, but instead converted HUNTGEM as their own website purporting to sell goods of their own choosing and have refused to release the website to SINCLAIR.  When SINCLAIR placed an order on the HUNTGEM domain owned by SINCLAIR and functionally converted by

**Complaint**

Defendants, payment was taken by Defendants but products were never delivered. On information and belief, Defendants are utilizing the HUNTGEM website and domain as a mode for their fraudulent transactions.

31.    As of the date of the filing of this Complaint, Defendants have failed and refused to deliver to Plaintiffs a functioning HUNTGEM website as contracted.  Instead, Defendants appear to be operating the website for their fraudulent activities.

**B. Dreamoway**

32.    During her initial conversations with Defendants concerning HUNTGEM, SINCLAIR also mentioned that her company DREAMOWAY, INC. required new developers to develop a desktop website interface and maintain the mobile applications for the Dreamoway social media network that she had created. Defendants represented to her that they had a large team of web and mobile developers who could update her mobile applications with a more modern interface within sixty to ninety days and create a new desktop website interface for Dreamoway within thirty (30) days.

33.    Plaintiffs reasonably relied on these representations and executed a written agreement for "Mobile Application Design & Development & Maintenance" with Defendants on or about August 30, 2022 (the "Dreamoway Development Contract"). The agreement specified that the project timeline would be sixty to ninety days and provided that, in all, Plaintiffs would pay Defendants a fixed rate price of $35,000 for their services.

34.    Plaintiffs concurrently paid Defendants an initial deposit of $14,500 pursuant to the agreement, then paid a second installment of $10,000 to Defendants on or about November 14, 2022, and a third installment of $8,822.75 to Defendants on or about January 23, 2023.

///

35.    On August 24, 2022, Defendants requested an additional payment in the amount of $3,999 as a necessity to finish the application, which was paid in order to complete the application as quickly as possible.

36.    All of Defendants' representations were false. As of the date of the filing of this Complaint, Defendants have still not completed either the Dreamoway mobile application or the Dreamoway desktop website.

37.    On or about September 1, 2022, Defendants requested Plaintiffs pay an additional sum of approximately $5,000 to finance marketing efforts for Dreamoway through social media accounts, social media campaigns, search engine optimization, Google Business, Google Maps, and Google Analytics. To persuade Plaintiffs to pay this amount, Defendants represented to Plaintiffs that the entire Dreamoway project would be completed within seventy days and that it would be crucial for Plaintiffs to begin marketing Dreamoway without further delay to build a stronger brand.

38.    Plaintiffs reasonably relied upon these representations and executed a written agreement for 6 months of "Search Engine Optimization" and "Social Media Management" with Defendants (the "Dreamoway Marketing Contract"). Plaintiffs concurrently paid Defendants $5,000 pursuant to that agreement for Dreamoway.

39.    Defendants' representations were again false. As of the date of the filing of this Complaint, Defendants have still not completed either the Dreamoway mobile application or the Dreamoway desktop website.

40.    On or about November 11, 2022, Defendants requested Plaintiffs pay an additional sum of $8,899 to purchase and install various APIs and SDKs with the Dreamoway mobile applications and desktop website. Plaintiffs represented that these additional APIs and SDKs would be necessary to enable features such as noise

**Complaint**

cancellation, voice effects, and video filters/effects for calls and recordings made on the Dreamoway social media network.

41.     Plaintiffs reasonably relied upon these representations and executed a written agreement for "API's & SDK's Purchase & Installation" with Defendants on or about November 11, 2022 (the "Dreamoway API Contract"). Plaintiffs concurrently paid Defendants $8,899 pursuant to that agreement.

42.     There was no valid consideration for this agreement due to the fact that Plaintiffs had already contracted and paid for "3rd Party API Integrations" as part of the Dreamoway Development Contract.

43.     Defendants' representations also proved to be false; to date, Defendants have not added any of the promised features to the Dreamoway mobile applications or desktop website.

44.     On or about March 30, 2023, Defendants represented to Plaintiffs that the Dreamoway mobile application was nearly complete. Defendants told Plaintiffs that the final item needed to complete the app would be the integration of "Auth0 APIs" that would enable the application's users to create accounts and log into the application. Defendants requested Plaintiffs pay an additional payment of $5,000 for this purpose, and they assured Plaintiffs that the application would be completed within a "few days" once the payment was made.

45.     Plaintiffs reasonably relied upon these representations and entered into an oral contract with Defendants to pay $5,000 in exchange for the aforementioned services (the "Dreamoway Auth0 Contract"). SINCLAIR concurrently paid $5,000 to Defendants pursuant to this contract.

///

**Complaint**

46. There was no valid consideration for this agreement due to the fact that Plaintiffs had already contracted and paid for "Login/Signup," "Two-Factor Authentication," and "3rd Party API Integrations" as part of the Dreamoway Development Contract.

47. Defendants' representations were false. As of the date of the filing of this Complaint, Defendants have still not complete or deliver the Dreamoway mobile application.

48. Plaintiffs had repeatedly informed Defendants, since before they executed the Dreamoway Development Contract with Defendants, that time would be of the essence for the Dreamoway website and mobile applications because Plaintiffs had already entered into negotiations to have a television show produced about the Dreamoway social media network, and that Plaintiffs had already entered into a written agreement and paid substantial fees to have a promotional reel produced to promote this television show concept.

49. In response, Defendants had represented to Plaintiffs that they would complete the Dreamoway website and mobile applications well in advance of the sixty-to-ninety-day timelines specified in the agreements. However, Defendants did not deliver the Dreamoway website and mobile applications by those timelines, causing Plaintiffs to lose all the fees they had paid for the production of the reel.

50. Indeed, as of the date of the filing of this Complaint, Defendants continue to allege that development of the Dreamoway mobile applications is still in progress, but they refuse to produce any of the code or other work product which they have generated to Plaintiffs. Additionally, Defendants have admitted to Plaintiffs that they have not even commenced work on the Dreamoway website at all, yet they have refused to honor

12

**Complaint**

Plaintiffs' repeated requests for a refund of the fees which they have paid for the Dreamoway website.

**C. Additional Wrongdoing**

51.    On or about September 13, 2022, Defendants requested that Plaintiffs pay $4,200 for two years of "Dedicated Server" hosting which would be shared by HUNTGEM and Dreamoway. Defendants assured Plaintiffs that they would transfer all files relating to HUNTGEM and Dreamoway to this "Dedicated Server" so that she would not need to pay any other hosting charges for the next two years. Defendants also assured Plaintiffs that they would be provided complete access to the website's administrative cPanel feature. Defendants also told Plaintiffs that they would be allocated a technical project manager for real-time 24/7 assistance with her applications and websites.

52.    SINCLAIR reasonably relied upon these representations and entered into an oral contract with Defendants to pay $4,200 in exchange for the aforementioned services (the "Hosting Contract"). SINCLAIR concurrently paid $4,200 to Defendants pursuant to this contract.

53.    Defendants' representations proved to be false, as Defendants failed to transfer critical files for the existing Dreamoway mobile applications from Amazon Web Services to the new "Dedicated Server." Plaintiffs have been forced to continue paying every month for Amazon Web Services hosting in addition to AGILE's "Dedicated Server" hosting, at an extra cost of approximately $4,200 as of the date of the filing of this Complaint. Defendants also failed to provide Plaintiffs with any administrative access to the website, including to the website's cPanel. Plaintiffs have also never been allocated a dedicated technical project manager or received real-time assistance with any issue with their applications or website.

**Complaint**

54.     On or about October 6, 2022, Defendants requested that Plaintiffs pay $8,822 for Defendants to purchase and install "APIs and SDKs" for payment integration for HUNTGEM and Dreamaway.

55.     SINCLAIR reasonably relied upon these representations and entered into an oral contract with Defendants to pay $8,822 in exchange for the aforementioned services (the "Payment Integration Contract"). SINCLAIR concurrently paid $8,822 to Defendants pursuant to this contract.

56.     There was no valid consideration for this agreement due to the fact that Plaintiffs had already contracted and paid for "Payment Module Integration" as part of the Second HUNTGEM Contract and the Dreamaway Development Contract.

57.     All of Plaintiffs' efforts to obtain the contracted work products or refunds for monies paid were futile.  At all times Plaintiffs requested that the website and applications be turned over into Plaintiffs' custody, Defendants threatened to sell Plaintiffs' website and applications to third parties if additional monies were not paid to them to deliver the final products or that they would continue to utilize them for their own use if additional monies were not paid.

**COUNT I:**

**BREACH OF WRITTEN CONTRACT**

**(By all Plaintiffs against all Defendants)**

58.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

59.     Plaintiffs and Defendants entered into the written contracts described herein as the HUNTGEM Marketing Contract, the Dreamaway Development Contract, the Dreamaway Marketing Contract and the Dreamaway API Contract (collectively, the

14

**Complaint**

"Written Contracts").

60.     Defendants breached the Written Contracts by engaging in the conduct herein alleged, including but not limited to:

       i.  Failing to deliver the contracted-for websites and mobile applications within the timelines provided for by the Written Contracts.

     ii.  Failing to deliver the contracted-for websites and mobile applications in reasonable working condition.

   iii.  Failing to comply with Plaintiffs' specifications for the design of the contracted-for websites and mobile applications.

   iv.  Refusing to honor Plaintiffs' refund requests pursuant to Defendants' 100% Satisfaction Guarantee and 100% Money Back Guarantee.

61.     As a result of Defendants' breaches of contract, Plaintiffs have suffered economic damages, including lost profits, in an amount subject to proof at trial and in excess of the jurisdictional limit.

## COUNT II:

## BREACH OF ORAL CONTRACT

### (By all Plaintiffs against all Defendants)

62.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

63.     Plaintiffs and Defendants entered into the oral contracts described herein as the First HUNTGEM Contract, the Second HUNTGEM Contract, the Dreamaway Auth Contract, the Hosting Contract and the Payment Integration Contract (collectively, the "Oral Contracts").

///

64.     Defendants breached the Oral Contracts by engaging in the conduct herein alleged, including but not limited to:

         i.   Failing to deliver the contracted-for websites and mobile applications within the timelines provided for by the Oral Contracts.

        ii.   Failing to deliver the contracted-for websites and mobile applications in reasonable working condition.

       iii.   Failing to comply with Plaintiffs' specifications for the design of the contracted-for websites and mobile applications.

       iv.   Refusing to honor Plaintiffs' refund requests pursuant to Defendants' 100% Satisfaction Guarantee and 100% Money Back Guarantee.

65.     As a result of Defendants' breaches of contract, Plaintiffs have suffered economic damages, including lost profits, in an amount subject to proof at trial and in excess of the jurisdictional limit.

## COUNT III:

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (By all Plaintiffs against all Defendants)

66.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

67.     Plaintiffs entered into the Written Contracts and the Oral Contracts (collectively, the "Contracts") with Defendants as alleged above.

68.     Defendants breached the implied covenant of good faith and fair dealing because they consciously, deliberately, and in bad faith interfered with Plaintiffs' rights to receive the benefits contemplated by the Contracts by engaging or assisting in the conduct alleged herein, including but not limited to:

**Complaint**

  i. Failing to deliver the contracted-for websites and mobile applications within the timelines provided for by the Contracts.

  ii. Failing to deliver the contracted-for websites and mobile applications in reasonable working condition.

  iii. Failing to comply with Plaintiffs' specifications for the design of the contracted-for websites and mobile applications.

  iv. Refusing to honor Plaintiffs' refund requests pursuant to Defendants' 100% Satisfaction Guarantee and 100% Money Back Guarantee.

  v. Providing false and fraudulent information regarding the status of the contracted-for websites and mobile applications.

  vi. Making false promises with intend to hold Plaintiffs' assets hostage, including the website and applications, in order to siphon large sums of money from Plaintiffs by threatening to sell Plaintiffs' assets in Defendants' control and otherwise threaten to hold back Plaintiffs' assets unless additional monies were paid to them above and beyond what was originally contracted.

69. As a direct and proximate result of Defendants' breaches of the covenant of good faith and fair dealing, Plaintiffs have suffered significant damages in an amount subject to proof at trial and in excess of the jurisdictional limit.

## COUNT IV:

## FRAUD

### (By all Plaintiffs against all Defendants)

70. Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

**Complaint**

71.    Defendants promised to deliver full and complete products for HUNTGEM and Dreamaway as more specifically alleged above.

72.    Defendants did not intend to perform any of the promises when they made them, but intended to hold Plaintiffs' assets hostage, including the website and applications, in order to siphon large sums of money from Plaintiffs by threatening to sell Plaintiffs' assets in Defendants' control and otherwise threaten to hold back Plaintiffs' assets unless additional monies were paid to them above and beyond what was originally contracted.

73.    Defendants intended that Plaintiffs rely on their false promises;

74.    Plaintiffs reasonably relied on Defendants' promises;

75.    Defendants did not perform the promised acts;

76.    Plaintiffs were harmed;

77.    Plaintiffs' reliance on Defendants' promise was a substantial factor in causing Plaintiffs' harm.

78.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant damages in an amount subject to proof at trial and in excess of the jurisdictional limit.

79.    These Defendants' conduct constitutes oppressive, malicious and fraudulent conduct justifying an award of exemplary/punitive damages.

## COUNT V:

## THEFT (CAL. PENAL CODE § 496)

### (By all Plaintiffs against all Defendants)

80.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

///

**Complaint**

81.     Defendants defrauded Plaintiffs of money through false and fraudulent promises, representations, and pretenses as set forth herein.

82.     Defendants are in receipt of the money which they defrauded Plaintiffs of and know that the money was obtained through false and fraudulent representations and pretenses.

83.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant damages in an amount subject to proof at trial and in excess of the jurisdictional limit.

84.     Plaintiffs are authorized to bring this action for three times their actual damages, together with reasonable attorney's fees and costs, pursuant to Penal Code 496(c).

<u>**COUNT VI:**</u>

<u>**UNFAIR/UNLAWFUL BUSINESS PRACTICES**</u>

<u>**(CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.)**</u>

**(By all Plaintiffs against all Defendants)**

85.     Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

86.     Defendants have engaged and continue to engage in unfair business practices in California in violation of Business and Professions Code § 17200, et seq., by engaging in the conduct alleged herein, including but not limited to:

    i.   Failing to deliver the contracted-for websites and mobile applications within the timelines provided for by the Contracts.

    ii.  Failing to deliver the contracted-for websites and mobile applications in reasonable working condition.

**Complaint**

  iii. Failing to comply with Plaintiffs' specifications for the design of the contracted-for websites and mobile applications.

  iv. Refusing to honor Plaintiffs' refund requests pursuant to Defendants' 100% Satisfaction Guarantee and 100% Money Back Guarantee.

  v. Falsely representing to Plaintiffs:

    1. That Defendants intended to fully and timely perform their obligations to Plaintiffs under the Contracts.

    2. That AGILE had a team of 330 developers and 33 lawyers.

    3. That AGILE's average e-commerce website customers earned between $5,000 to $10,000 in net profit every month.

    4. On or about August 31, 2022, that the HUNTGEM website was nearly complete.

    5. On or about September 13, 2022, that Plaintiffs would not be required to pay for any other hosting costs if they paid for AGILE's two-year "Dedicated Server" plan.

  vi. Making false promises with intend to hold Plaintiffs' assets hostage, including the website and applications, in order to siphon large sums of money from Plaintiffs by threatening to sell Plaintiffs' assets in Defendants' control and otherwise threaten to hold back Plaintiffs' assets unless additional monies were paid to them above and beyond what was originally contracted.

87. Defendants' conduct constitutes unfair competition because they provide Defendants an unfair advantage over their competitors who comply with the same laws Defendants have disregarded and with which Defendants continue to fail to comply.

**Complaint**

88.     Additionally, Defendants have engaged and continue to engage in unlawful business practices in California in violation of Business and Professions Code § 17200, et seq., by engaging in the conduct alleged herein, including but not limited to falsely representing to Plaintiffs:

      i.   That Defendants intended to fully and timely perform their obligations to Plaintiffs under the Contracts.

     ii.   That AGILE had a team of 330 developers and 33 lawyers.

   iii.   That AGILE's average e-commerce website customers earned between $5,000 to $10,000 in net profit every month.

   iv.   On or about August 31, 2022, that the HUNTGEM website was nearly complete.

    v.   On or about September 13, 2022, that Plaintiffs would not be required to pay for any other hosting costs if they paid for AGILE's two-year "Dedicated Server" plan.

   vi.   Making false promises with intend to hold Plaintiffs' assets hostage, including the website and applications, in order to siphon large sums of money from Plaintiffs by threatening to sell Plaintiffs' assets in Defendants' control and otherwise threaten to hold back Plaintiffs' assets unless additional monies were paid to them above and beyond what was originally contracted.

89.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant damages in an amount subject to proof at trial and in excess of the jurisdictional limit.

///

90.    Plaintiffs are authorized to bring this action for appropriate injunctive relief and to recover all money and property acquired by Defendants by their unlawful actions, pursuant to Business and Professions Code 17204.

## COUNT VII:

## UNJUST ENRICHMENT

### (By all Plaintiffs against all Defendants)

91.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

92.    By engaging in wrongful acts as alleged herein, Defendants, and each of them, have received substantial benefits from Plaintiffs by unlawful or fraudulent means.

93.    Retention of the benefits received by Defendants, and each of them, would be unjust.  Those benefits received by Defendants, and each of them, include, without limitation, the monies paid to them by Plaintiffs as alleged herein.

94.    Because of Defendants' wrongful acts, each Defendant holds the wrongfully acquired moneys and rights, together with all profits and advantages derived from them, as constructive trustees for the benefit of Plaintiffs.

95.    As a direct and proximate result of Defendants' conduct, Defendants have been unjustly enriched, and Plaintiffs are entitled to restitution in an amount subject to proof at trial and in excess of the jurisdictional limit.

## COUNT VIII:

## DECLARATORY RELIEF

### (By all Plaintiffs against all Defendants)

96.    Plaintiffs reallege and incorporate by reference all preceding and subsequent paragraphs as though fully set forth herein.

**Complaint**

97.   An actual controversy has arisen and now exists between Plaintiffs and Defendants with respect to the Contracts alleged above. Plaintiffs contend that they are entitled to rescind the Contracts because Defendants induced Plaintiffs to enter into them through fraud and because of the failure of Defendants' consideration with respect to those Contracts, as alleged herein. Plaintiffs contend that Plaintiffs' prior requests to Defendants to cancel the Contracts and receive a refund constitute sufficient notice of rescission under applicable law. In the alternative, Plaintiffs intend that service of this pleading shall constitute notice of rescission of the Contracts and an offer by Plaintiffs to restore to Defendants everything of value that Plaintiffs received from Defendants under the contract on the condition that Defendants do likewise.

98.   On information and belief, Plaintiffs allege that Defendants dispute that Plaintiffs have properly rescinded the Contracts and Defendants dispute that Plaintiffs are entitled to rescind the Contracts.

99.   The controversy between Plaintiff and Defendants is a proper subject for declaratory relief.  Indeed, a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights, duties, and obligations with respect to the Contracts.

100.   Plaintiffs are entitled to a judicial declaration that they are entitled to rescind the Contracts, that they have properly rescinded the Contracts, and that they are entitled to restitution of all the consideration that they have paid to Defendants under the Contracts.

101.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant damages in an amount subject to proof at trial and in excess of the jurisdictional limit. An award of consequential damages, in addition to restitution of the consideration given to Defendants, is necessary to restore Plaintiffs to their economic

**Complaint**

position before entering into the Contracts.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for judgment against Defendants as follows:

**ON COUNT I:**

1.    For actual damages in an amount to be determined at trial.

**ON COUNT II:**

1.    For actual damages in an amount to be determined at trial.

**ON COUNT III:**

1.    For actual damages in an amount to be determined at trial.

**ON COUNT IV:**

1.    For actual damages in an amount to be determined at trial.

2.    For exemplary/punitive damages in an amount to be determined at trial.

**ON COUNT V:**

1.    For treble damages in an amount to be determined at trial.

2.    For Plaintiffs' reasonable attorney's fees and costs.

**ON COUNT VI:**

1.    For restitution in an amount to be determined at trial.

2.    For such other and further injunctive relief as the Court may deem just and proper.

**ON COUNT VII:**

1.    For restitution in an amount to be determined at trial.

**ON COUNT VIII:**

1.    For a determination by the Court that Plaintiffs are entitled to rescind the Contracts and that the Contracts have been rescinded.

**Complaint**

2. For restitution of all consideration given by Plaintiffs to Defendants pursuant to the Contracts.

3. For consequential damages in an amount to be determined at trial.

**ON ALL COUNTS:**

1. For such other and further relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For actual and consequential damages;

2. For exemplary and punitive damages;

3. For restitution;

4. For prejudgment interest;

5. For costs of suit; and

6. For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury in the above-captioned action of all issues triable by jury.


Dated: May 31, 2023                          **L&F BROWN, P.C.**

                                   By:    /s/ Joon Song
                                          _____
                                          JOON SONG
                                          JOYCE H. MA
                                          JEREMY WANG

                                          *Attorneys for Plaintiff JUSTINE SINCLAIR*
                                          *and DREAMOWAY, INC.*

**Complaint**