UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JUSTIN SINCLAIR, et al, | Case No. 23-cv-02690-HSG (LB) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | Re: ECF No. 165 |
| AGILE WEB STUDIOS, et al., | |
| Defendants. | |

## INTRODUCTION

The plaintiffs contracted with the defendants to develop the plaintiffs' online store and provide other ecommerce services. Over time, the defendants demanded more money to finish the job but never delivered the promised products. The plaintiffs sued for breach of contract, fraud, and related claims and, after the defendants defaulted, moved for default judgment of $582,827.43 in compensatory damages, $1,748,482.29 in treble and punitive damages, $186,099.61 in attorney's fees, and $15,221.66 in costs. The court recommends granting default judgment and awarding $581,408.60 in compensatory damages, $1,744,225.80 in treble damages (both reduced by discrepancies between the summary of damages and supporting invoices) and the full amount of the plaintiffs' requests for attorney's fees and costs.

*United States District Court*
*Northern District of California*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**STATEMENT**

Plaintiff Justine Sinclair, who resides in Texas, has an ecommerce business called Huntgem, which sells clothes and other fashion products.[1] She hired the defendants to set up an online store for Huntgem and to develop a desktop interface and mobile app for her social-media network DreamOway, a Delaware corporation with its principal place of business in Delaware, which is a plaintiff too.[2] The plaintiffs assert that the defendants induced them to contract for these services, knowing that they could not deliver them and exacting additional payments along the way.[3]

The next sections summarize the parties and their roles, the contracts, damages, and service.

**1. The Parties and Their Roles**

The defaulting defendants include three related businesses and two principals. Agile Web Studios is a "business entity" located in San Jose.[4] Its principals, who both allegedly live in Santa Clara County, are Agile's Senior Vice President Tyler Scott and Associate Vice President Alex Martin, who are the principals of the other defendant businesses: (1) Dynamic Solutions, LLC, a Virginia limited-liability corporation with its principal place of business in Virginia, (2) VTLogo Inc., a Florida corporation with its principal place of business in Florida, and (3) One Stop Computer Services LLC, a Virginia limited-liability corporation with its principal place of business in Virginia.[5] The final defaulting defendant is Muhammad Usman Khan, who the

---

[1] First Am. Compl. (FAC) – ECF No. 100 at 6 (¶ 24). Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

[2] *Id.* at 6–7 (¶¶ 25–26), 9 (¶ 37).

[3] *Id.* at 6–13 (¶¶ 25–36, 38–55).

[4] *Id.* at 2 (¶ 3). The business name does not appear in a California Secretary of State business-records search. *See* https://bizfileonline.sos.ca.gov/search/business; *Lee v. County of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (judicial notice of public records); *White v. Soc. Sec. Admin.*, No. 14-cv-05604-JST, 2015 WL 3902789, at *2 (N.D. Cal. June 24, 2015) (judicial notice of policy documents on government website); *Gustavson v. Mars, Inc.*, No. 13-cv-04537-LHK, 2014 WL 2604774, at *3 n.1 (N.D. Cal. June 10, 2014) (judicial notice of FDA letters and press releases).

[5] FAC – ECF No. 100 at 2–3 (¶¶ 4–9).

plaintiffs believed lived in Virginia but now appears to live in Pakistan and is VTLogo's director, officer, and registered agent.[6]

The defendants' roles in the scheme were as follows. Agile contracted to develop and maintain the Huntgem website and to upgrade DreamOway's website and app (called Dream App), which is a platform for users to upload their talent videos as auditions for a reality show. Agile never delivered the promised products.[7] Scott and Martin were the primary contacts at Agile.[8] The plaintiff paid them by wire transfer to accounts in VTLogo's and Dynamic Solutions' names and by credit-card payments to VTLogo, Dynamic, and OneStop. Scott told her VTLogo and Digital were part of Agile.[9]

## 2. The Huntgem Contracts

The plaintiff entered an oral contract with Agile to create an ecommerce Shopify store for Huntgem in exchange for a one-time $550 payment. (Shopify is an ecommerce platform.) She paid $550 on August 16, 2022. VTLogo processed the transaction as "Agile Web Studio Orlando FL."[10] Agile never delivered a Shopify ecommerce store.[11] Instead, it kept the $550 as a "speed service fee" and orally contracted to create a non-Shopify website (thereby avoiding Shopify fees) within two weeks for an additional $2,648. The promised services were the formation of a business entity, copyright registrations for Huntgem's intellectual property, social-media

---

[6] *Id.* at 4 (¶ 15); Articles of Inc., Ex. 27 to Mot. – ECF No. 168-1 at 387–88. The plaintiffs named other defendants (RFK Technologies Ltd., Rameez Tayyabi (also known as Ray Milner), Western Web & App Studios, Creatadors LLC, and Muhammad Hassan Raza), but they dismissed them. FAC – ECF No. 100 at 3–4 (¶¶ 11–15); Dismissals – ECF Nos. 132, 142, 163, 164.

[7] FAC – ECF No. 100 at 6–7 (¶¶ 24–26), 9–14 (¶¶ 37–62), 17–18 (¶¶ 73, 77), 20–21 (¶¶ 91, 93).

[8] *See, e.g., id.* at 7–8 (¶¶ 28–29, 32).

[9] *Id.* at 4–5 (¶¶ 17–20) (alleging that the entities were alter egos of each other and the individual defendants); Sinclair Decl. – ECF No. 177 at 2–4 (¶¶ 9–12), 5 (¶ 14), 6–9 (¶¶ 19–23).

[10] FAC – ECF No. 100 at 6–7 (¶¶ 25–28); Sinclair Decl. – ECF No. 177 at 2–3 (¶ 9); Invoice, Ex. 2 to Mot. – ECF No. 168-1 at 11–14.

[11] FAC – ECF No. 100 at 7 (¶ 28), 9 (¶ 34); Sinclair Decl. – ECF No. 177 at 5 (¶ 13).

United States District Court
Northern District of California

United States District Court
Northern District of California

marketing of Huntgem's products, and managing customer orders.[12] VTLogo received the payment. The plaintiff never received the product. On August 24, 2022, Agile asked for an additional $3,999 to complete the site. The plaintiff paid it, and VTLogo processed the payment.[13] On August 31, 2022, Agile asked for $2,500 more for social-media management and search-engine optimization. The plaintiff paid it, and VTLogo processed the payment. To induce the last payment, Scott said that the website was nearly complete, when it was not.[14] In all, the plaintiff paid Agile $9,697, all processed by VTLogo.[15]

The plaintiff contends that the defendants knew that their representations to her were false and intended to persuade her to purchase their services. The defendants continue to control the website www.huntgem.com and appear to be using it for fraudulent transactions, evidenced by the plaintiff's ordering items from Huntgem, the defendants' accepting payment, and the products never being delivered.[16]

### 3.  The DreamOway Contracts

In 2022, DreamOway had a contract to develop a reality TV show based on videos uploaded to its existing app, called the Dream App.[17] The plaintiff launched the app in 2018, selling her home and using her 401(k) account to hire developer Blue Label to build the app for $211,687.80.[18] From 2019 until September 2022, when she transferred the app to Agile, the plaintiff paid

---

[12] FAC – ECF No. 100 at 7–8 (¶ 28); Sinclair Decl. – ECF No. 177 at 3–4 (¶ 10); Payment Rs., Ex. 3 to Mot. – ECF No. 168-1 at 10–14.

[13] FAC – ECF No. 100 at 10 (¶ 40); Sinclair Decl. – ECF No. 177 at 4 (¶ 11); Payment Rs., Ex. 4 to Mot. – ECF No. 168-1 at 15–18.

[14] FAC – ECF No. 100 at 8 (¶ 32); Sinclair Decl. – ECF No. 177 at 4 (¶ 12); Payment Rs., Ex. 5 to Mot. – ECF No. 168-1 at 19–30.

[15] Sinclair Decl. – ECF No. 177 at 5 (¶ 14).

[16] FAC – ECF No. 100 at 7–9 (¶¶ 25–28, 30–31, 34–36); Sinclair Decl. – ECF No. 177 at 2–5 (¶¶ 8, 10, 15); Payment Rs., Ex. 3 to Mot. – ECF No. 168-1 at 10–14.

[17] FAC – ECF No. 100 at 9 (¶ 37), 12 (¶ 53).

[18] Sinclair Decl. – ECF No. 177 at 11 (¶ 34).

providers BUILTbybackspace and MobiDev $47,376.46 and $40,477.95, respectively, for tech support. She paid RizenApp $85,742 to ready the app for online app stores.[19]

On August 30, 2022, DreamOway and Agile entered a written contract with a limitation-of-liability provision disclaiming damages of lost revenues, lost profits, and costs of delays.[20] In return for $35,000, Agile would update the Dream App within sixty to ninety days (the deadline to submit the app for use with the TV show) and create a new desktop interface within thirty days.[21] DreamOway wired money in three installments: $14,500 on September 6, 2022 (received by VTLogo), $10,000 on November 14, 2022 (received by VTLogo), and $8,822.75 on January 23, 2023 (received by Dynamic). Under the contract, the third installment was payable when the product was delivered, but Scott told the plaintiff to pay the money in advance.[22]

On September 1, 2022, Agile asked for an additional $5,000 to market DreamOway through social-media accounts, social-media campaigns, search-engine optimization channels, Google Business, Google Maps, and Google Analytics. To induce this payment, Agile said that it would complete the entire DreamOway project within seventy days, allowing earlier marketing, and it said that the app and website were nearly complete. On September 2, 2022, the parties entered into a second contract with the same limitation-of-liability provision, and the plaintiff paid $5,000 (received by VTLogo).[23]

On November 11, 2022, Agile asked for an additional $8,899 for website and app features such as noise cancellation, voice effects, and video effects. The plaintiffs had already contracted for this

---

[19] *Id.* at 11–12 (¶ 35); Invoices, Exs. 18–19 to Mot. – ECF No. 168-1. Although the plaintiffs' summary of damages lists $48,794.79 in payments to BUILTbybackspace, the invoices add up to $47,376.46. Invoices, Ex. 18 to *id.* – ECF No. 168-1 at 173–245.

[20] Contract, Ex. 7 to Sinclair Decl. – ECF No. 168-1 at 38–47.

[21] FAC – ECF No. 100 at 10 (¶ 38); Contract, Ex. 7 to Sinclair Decl. – ECF No. 168-1 at 38–47.

[22] FAC – ECF No. 100 at 10 (¶ 38); Sinclair Decl. – ECF No. 177 at 6–7 (¶ 19); Payment Rs., Ex. 7 to Mot. – ECF No. 168-1 at 37–64.

[23] FAC – ECF No. 100 at 10 (¶ 42); Sinclair Decl. – ECF No. 177 at 7 (¶ 20); Payment Rs., Ex. 8 to Mot. – ECF No. 168-1 at 65–75.

1    service in the initial contract but, that day, signed a separate contract with the same limitation of

2    liability and paid $8,899 (received by OneStop).[24]

3         On March 30, 2023, Agile said that the app and website were nearly finished and asked for an

4    additional $5,000 to integrate functions that would allow users to create accounts and log into the

5    app. DreamOway agreed to the oral contract and made two payments, $2,500 on March 30, 2023,

6    by credit card (received by Abbtech) and $2,500 on April 7, 2023 (received by dismissed

7    defendant RFK Technologies, also affiliated with the Agile defendants).[25]

8         In all, the plaintiff paid Agile $52,221.75: (1) $29,500 (received by VT Logo), $8,822.75

9    (received by Dynamic), $2,500 (received by Abtech), $2,500 (received by RFK), and $8,999

10   (received by One Stop).[26]

11

12   **4.    Additional Payments**

13        The plaintiffs made additional payments totaling $29,222 for services meant to benefit

14   Huntgem and DreamOway: $4,200 on September 13, 2022, for a dedicated server and Cloud

15   database (received by VTLogo), and $8,822 and $16,200 on October 6 and 7, 2022, for payment-

16   integration services (received by DDS).[27]

17

18   **5.    Conversion of the Website and App**

19        The plaintiffs gave Agile access to Huntgem's website and the Dream App, including the app's

20   source code and social media. In a text-message exchange on June 19, 2023, Scott and Martin said

21   that they were withholding the property unless the plaintiffs dropped the lawsuit: "if [the Action] is

22   not stopping, then I'm not giving a piece of the project to you, i.e. all the websites and Apps . . . .

23   [C]ertainly I would have to spend money on the case and lawyers and you will be losing

24

---

25   [24] FAC – ECF No. 100 at 11 (¶¶ 45, 47); Sinclair Decl. – ECF No. 177 at 6–8 (¶¶ 19, 21); Payment Rs., Exs. 7, 9 to Mot. – ECF No. 168-1 at 37–64, 76–90.

26   [25] FAC – ECF No. 100 at 11–12 (¶¶ 49–50); Sinclair Decl. – ECF No. 177 at 8 (¶ 22).

27   [26] Sinclair Decl. – ECF No. 177 at 9 (¶¶ 22–23).

     [27] FAC – ECF No. 100 at 13–14 (¶¶ 56–61); Sinclair Decl. – ECF No. 177 at 9–10 (¶¶ 24–26);
28   Payment Rs., Exs. 11–13 to Mot. – ECF No. 168-1 at 104–23.

United States District Court
Northern District of California

1  everything . . . . Company won't give you the app [i]f it is getting into a legal battle . . . you have

2  your everything on stake."[28] Emails to Scott and Martin have not been answered, and their phone

3  numbers are disconnected.[29]

4

5  **6.  Summary of Damages**

6      The $582,827.43 in compensatory damages sought by the plaintiffs includes payments for

7  services that the defendants did not render for Huntgem and the Dream App and conversion of both.

8  For Huntgem, the plaintiffs paid the defendants a total of $9,697: $550 (to create a Shopify store),

9  $2,648 (to create an online store from scratch), $3,999 (add-on features), and $2,500 (marketing).[30]

10      For the Dream App, the plaintiffs paid the defendants $52,221.75 to update the application and

11  create a new "desktop website interface": $14,500 (initial deposit), $10,000 (second installment on

12  the damages chart but not noted in the FAC), $8,822.75 (third installment), $5,000 (marketing),

13  $8,899 (to purchase and install APIs and SDKs), $5,000 (to enable users to create accounts).[31]

14      The plaintiffs made additional payments for $4,200 (hosting services) and $8,822 (payment

15  integration), totaling $13,022.[32] The plaintiffs listed an additional $16,200 for payment integration

16  in the summary of damages but did not list this payment in the FAC.[33]

17      The plaintiffs paid $490,267.85 to develop the Dream App: $211,687.80 (to Blue Label

18  Solutions, LLC), $47,376.46 (to BUILTbybackspace), $85,742 (to Rizen), $40,477.95 (to

19  MobilDev Corp.), $25,000 (to Ruple Consultants, LLC and Potomac Strategy Group, LLC),

20

21

22  [28] FAC – ECF No. 100 at 14–15, 17–18, 20 (¶¶ 62, 73, 77, 91); Sinclair Decl. – ECF No. 177 at 10–11 (¶¶ 27–29); Payment Rs., Exs. 14–16 to Mot. – ECF No. 168-1 at 124–68.

23  [29] Sinclair Decl. – ECF No. 177 at 11, 13 (¶¶ 30, 41); Amicucci Decl. – ECF No. 170 at 2–3 (¶¶ 8–9, 11–12); Wang Decl. – ECF No. 174 at 3 (¶¶ 11–12).

24  [30] Summ. of Damages – ECF No. 168-1 at 2. The FAC listed the $3,999 payment under the Dream App section. FAC – ECF No. 100 at 10 (¶ 40).

25  [31] Summ. of Damages – ECF No. 168-1 at 2; Sinclair Decl. – ECF No. 177 at 6–7 (¶ 19). The FAC does not list the second installment for $10,000. FAC – ECF No. 100 at 10 (¶ 39).

26  [32] Summ. of Damages – ECF No. 168-1 at 2; FAC – ECF No. 100 at 13–14 (¶¶ 56–62).

27  [33] Summ. of Damages – ECF No. 168-1 at 2.

28

United States District Court
Northern District of California

1  $75,000 (to Brian Kestner), and $4,983.64 (to Aws.Amazon).[34] After subtracting discrepancies

2  between the damage summary and invoices for BUILTbybackspace and Amazon ($1,418.33 and

3  .50 respectively), the record supports the plaintiffs seeking $581,408.60 in compensatory damages.

4  The plaintiffs seek $186,099.61 in attorney's fees ($139,597.91 from Cohen Law Group and

5  L&F Brown and $46,501 from Weintraub Tobin) and $15,221.66 in costs for (1) serving the

6  complaint, FAC, and third-party subpoenas, (2) conducting depositions, (3) investigation services,

7  (4) and serving Khan under the Hague Convention.[35]

8

9  **7. Facts about Service and Entry of Default**

10  The plaintiffs filed the lawsuit on May 31, 2023, and the first amended complaint on May 9,

11  2024.[36] The plaintiffs served the defendants as follows:

12  First, the plaintiffs attempted to serve Agile, Scott, and Martin at the address listed on Agile's

13  website (2033 Gateway Pl 5th Floor, San Jose, CA) and an address listed on Scott's and Martin's

14  LinkedIn profiles (6203 San Ignacio Ave, San Jose, CA), but the defendants were not tenants at

15  either address. Although the plaintiffs have discussed the case with Scott and Martin by phone and

16  email, they have been unable to identify a valid address for service.[37]

17  On October 24, 2023, the plaintiffs moved the district court to allow service by publication for

18  Agile, Scott, and Martin, contending that they had exhausted all other reasonable efforts.[38] The

19  court denied the motion.[39] The plaintiffs renewed their motion to serve the defendants by

20  publication in the San Francisco Times, and the court denied the motion again, suggesting that it

21  was inclined to grant the motion if the plaintiffs published notice in the San Francisco Chronicle

22

23  [34] *Id.* While the summary listed payments of $48,794.79 and $4,984.14, the supporting invoices (when added together) show payments of $47,376.46 to BUILTbybackspace and $4,983.64 to Aws.Amazon. Receipts, Exs. 18, 24 to Mot. – ECF No. 168-1 at 173–245, 314–68.

25  [35] Simonovich Decl. – ECF No. 172 at 2 (¶ 3); Invoices, Exs. 58–59 to Mot. – ECF No. 168-1; Simonovich Suppl. Decl. – ECF No. 190 at 3–4 (¶ 9).

26  [36] Compl. – ECF No. 1; FAC – ECF No. 100.

27  [37] Mot. – ECF No. 51 at 5–9.

[38] *Id.* at 4.

28  [39] Order – ECF No. 91.

instead.[40] The plaintiffs published notice in the San Francisco Chronicle in four successive weeks in 2024 (May 22 and 29 and June 5 and 12) and moved for entry of default against Agile, Scott, and Martin, and the Clerk of Court entered the defaults on July 10, 2024.[41]

Second, the plaintiffs served Dynamic Solutions and One Stop Computer Services by personal service to Ali Alam (an authorized agent) on June 7, 2023. The plaintiffs moved for entry of default against Dynamic and One Stop.[42] The Clerk of Court entered Dynamic's default on July 25, 2023, but declined to enter One Stop's default because Ali Alam was not the registered agent recorded with Virginia.[43] One Stop answered the complaint on July 31, 2023, denying all factual allegations.[44] The plaintiffs filed a stipulation to set aside the default, and Dynamic answered the complaint on October 5, 2023, denying all factual allegations.[45]

On January 12, 2024, counsel for Dynamic and One Stop moved to withdraw their representation from both defendants.[46] The court ordered counsel to file a supplemental declaration and attachments, counsel did so, and the court granted the motion to withdraw, allowing the plaintiffs to seek an entry of default if Dynamic or One Stop failed to obtain new counsel within twenty-one days.[47] The defendants did not obtain new counsel, the plaintiffs moved for entry of default against them, and the Clerk of Court entered the defaults on August 7, 2024.[48]

Third, the plaintiffs served Ali Alam as the owner of VTLogo and moved for entry of default, but the Clerk of Court declined because it was unable to verify that Ali Alam was the owner of

---

[40] Mot. – ECF No. 95; Order – ECF No. 99.

[41] Serv. by Publ'n – ECF No. 109; Mots. for Entry of Default – ECF Nos. 117–19; Entry of Default – ECF No. 121.

[42] Certificates of Serv. – ECF Nos. 10–11; Mots. for Entry of Default – ECF No. 18–19.

[43] Entry of Default – ECF No. 20; Declination of Entry of Default – ECF No. 21.

[44] Answer – ECF No. 22.

[45] Stipulation – ECF Nos. 23, 29; Answer – ECF No. 44.

[46] Mots. – ECF Nos. 60, 71.

[47] Order – ECF No. 91; Decl. – ECF No. 92; Order – ECF No. 110 at 3.

[48] Mots. – ECF Nos. 125–26; Entry of Default – ECF No. 127.

VTLogo.[49] On October 11, 2023, the plaintiffs reissued service to the Florida secretary of state under Florida Statutes § 48.101.[50] The plaintiffs moved for entry of default against VTLogo, which the Clerk of Court entered on January 12, 2024.[51]

The plaintiffs served the FAC under the same Florida statute on October 21, 2024, and served the FAC again with proof of delivery by FedEx on November 7, 2024.[52] They moved for entry of default, which the Clerk of Court entered on December 2, 2024.[53]

Fourth, the plaintiffs attempted (but failed) to serve Khan at a Virginia address listed on the articles of incorporation he filed with the Florida secretary of state and moved the court to approve email as an alternative form of service.[54] On October 23, 2024, the court denied the motion, directing the plaintiffs to reattempt service at the Virginia address.[55] The plaintiffs did so, failed again, and renewed the motion, and the court granted the motion, allowing service by email and directing counsel to serve Khan (pursuant to the Hague Convention) at two addresses in Pakistan listed for him in a separate case.[56] On January 17, 2025, the plaintiffs served Khan by email.[57] The plaintiffs moved for entry of default on February 10, 2025, and the Clerk of Court did so.[58] The plaintiffs employed Crowe Foreign Services to assist with serving Khan in Pakistan.[59] On May 22,

---

[49] Certificate of Serv. – ECF No. 27; Mot. – ECF No. 31; Declination of Entry of Default – ECF No. 36.

[50] Certificate of Serv. – ECF No. 47.

[51] Mot. – ECF No. 58; Entry of Default – ECF No. 59.

[52] Certificates of Serv. – ECF Nos. 140, 145.

[53] Mot. – ECF No. 146; Entry of Default – ECF No. 148.

[54] Mot. – ECF No. 138.

[55] Order – ECF No. 141.

[56] Mot. – ECF No. 153; Order – ECF No. 155 (citing No. 23-cv-5580-TLT, Goodell Decl. – ECF No. 56 at 4 (¶ 17)).

[57] Certificate of Serv. – ECF No. 159.

[58] Mot. – ECF No. 160; Entry of Default – ECF No. 162.

[59] Br. – ECF No. 167 at 31; Receipt, Ex. 59 to Mot. – ECF No. 168-2 at 375; Simonovich Decl. – ECF No. 172 at 4 (¶ 9).

1    2025, the plaintiffs received confirmation that Khan was personally served with the summons,

2    FAC, and accompanying documents pursuant to the Hague Convention on November 3, 2025.[60]

3        The docket does not reflect that the plaintiffs continued serving the defendants by email or mail

4    with filings after the entries of default.

5        On May 2, 2025, the plaintiffs attempted again to serve Tyler Scott, Alex Martin, and Agile by

6    email with copies of the summons, amended notice of the motion for default judgment, the FAC,

7    and the supporting memorandum, declarations, and exhibits. The emails were returned as

8    undeliverable. After reviewing prior correspondences with the defendants and the work of a

9    private investigation team hired to locate the defendants, the plaintiffs could not find alternative

10   addresses.[61]

11

12   **8.  Other Procedural History**

13       The FAC has the following claims: (1) breach of the Huntgem and DreamOway written

14   contracts; (2) breach of the Huntgem and DreamOway oral contracts; (3) breach of the implied

15   covenant of good faith and fair dealing; (4) fraud; (5) theft; (6) unlawful, fraudulent, and unfair

16   business practices, in violation of California's unfair competition law, Cal. Bus. & Prof. Code

17   § 17200; (7) unjust enrichment; and (8) declaratory relief.[62] After the Clerk of Court's entry of

18   default, the plaintiffs moved for default judgment against Agile, Scott, Martin, Dynamic, One

19   Stop, VTLogo, and Khan.[63] The court held hearings on April 17, 2025, and May 22, 2025. The

20   defendants did not appear.

21                     **JURISDICTION, VENUE, AND SERVICE**

22       Before entering default judgment, a court must determine whether it has subject-matter

23   jurisdiction over the action and personal jurisdiction over the defendants. *In re Tuli*, 172 F.3d 707,

24

25   _____

     [60] Simonovich Decl. – ECF No. 196-1 at 3 (¶¶ 1–3); Serv. Docs., Ex. A to *id.* – ECF No. 196-1 at 4–
26   13.

     [61] Simonovich Suppl. Decl. – ECF No. 190 at 2–3 (¶¶ 4–8).
27
     [62] FAC – ECF No. 100 at 1–5 (¶¶ 1–20).

28   [63] Mot. – ECF No. 165.

1    712 (9th Cir. 1999). A court must also ensure the adequacy of service on the defendant. *Timbuktu*

2    *Educ. v. Alkaraween Islamic Bookstore*, No. C 06–03025 JSW, 2007 WL 1544790, at *2 (N.D.

3    Cal. May 25, 2007).

4        First, the court has diversity jurisdiction: the parties are diverse, and the amount in controversy

5    exceeds $75,000. 28 U.S.C. § 1332(a)(1). "For purposes of diversity jurisdiction, an LLC — or

6    other unincorporated association — has the citizenship of all of its owners/members." *Motu Novu,*

7    *LLC v. Percival*, No. 16-cv-06545-SBA, 2018 WL 3069316, at *8 (N.D. Cal. May 7, 2018) (citing

8    *Johnson v. Columbia Props. Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006) and *Grupo*

9    *Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 586 (2004)). A corporation is "a citizen of every

10   State and foreign state by which it has been incorporated and of the State or foreign state where it

11   has its principal place of business." 28 U.S.C. § 1332(c)(1). The plaintiff resides in Texas. Her

12   corporation is a citizen of Delaware. The entity and individual defendants are all citizens of states

13   other than Texas and Delaware.

14       Second, venue is proper here. Venue exists (1) in a judicial district where the defendant

15   resides, (2) in a judicial district where "a substantial part of the events or omissions giving rise to

16   the claim occurred," or (3) if there is no district under (1) and (2), in any judicial district where the

17   defendant "is subject to the court's personal jurisdiction with respect to such action." 28 U.S.C.

18   § 1391(b). Agile resides here — Scott and Martin portrayed themselves as residing here too —

19   and the events and omissions happened here.

20       Third, there is personal jurisdiction over the main defendants: Agile and its principals Scott

21   and Martin. The other companies — Dynamic, VTLogo, and One Stop — are their alter egos.

22   There is also personal jurisdiction over Khan (the director of VTLogo) because the acts of

23   VTLogo's agents (Scott and Martin) are attributable to him.[64] *Sher v. Johnson*, 911 F.2d 1357,

24   1362 (9th Cir. 1990) ("For purposes of personal jurisdiction, the actions of an agent are

25   attributable to the principal.").

26

27

28   [64] Br. – ECF No. 167 at 18 (making this point).

United States District Court
Northern District of California

1      Fourth, as to service, parties must receive notice that is "reasonably calculated, under all the

2      circumstances, to apprise interested parties of the pendency of the action and afford them an

3      opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306,

4      314 (1950). "A federal court does not have jurisdiction over a defendant unless the defendant has

5      been served properly under [Rule 4]." *Direct Mail Specialists, Inc. v. Eclat Computerized Techs.,*

6      *Inc.*, 840 F.2d 685, 688 (9th Cir. 1988).

7      A corporation or partnership must be served in a judicial district of the United States in the

8      manner prescribed by Rule 4(e)(1) for serving an individual (i.e., "following state law for serving a

9      summons in an action brought in courts of general jurisdiction in the state where the district court

10     is located or where service is made") or "by delivering a copy of the summons and of the

11     complaint to an officer, a managing or general agent, or any other agent authorized by appointment

12     or by law to receive service of process and — if the agent is one authorized by statute and the

13     statute so requires — by also mailing a copy of each to the defendant." Fed. R. Civ. P. 4(h)(1).

14     "Under California law, a corporation or limited liability company can be served by delivering

15     the summons and complaint to one of an enumerated list of individuals, including the designated

16     agent for service of process or the general manager of the entity. In lieu of personal service on such

17     individual, substitute service may be effected 'by leaving a copy of the summons and complaint

18     during usual office hours in his or her office . . . with the person who is apparently in charge

19     thereof, and by thereafter mailing a copy of the summons and complaint by first-class mail,

20     postage prepaid to the person to be served at the place where a copy of the summons and

21     complaint were left.'" *Johnson v. Huong-Que Rest.*, No. 21-cv-04133-BLF, 2022 WL 658973, at

22     *2 (N.D. Cal. Mar. 4, 2022) (citing and quoting Cal. Civ. Proc. Code § 416.10) (other citation

23     omitted); *see also* Cal. Civ. Proc. Code §§ 416.10 (rules for serving corporations), 416.20 (service

24     on corporation that has forfeited its right to do business), 416.40 (rules for serving partnerships,

25     other unincorporated associations, and nonresident business entities); Cal. Corp. Code

26     § 17701.16(b) (service on LLCs); *Van v. Black Angus Steakhouses*, LLC, No. 5:17-cv-06329-EJD,

27     2018 WL 2763330, at *2–3 (N.D. Cal. June 8, 2018) (applying § 17701.16(b) to nonresident

28     LLC); *Heidorn v. BDD Mktg. & Mgmt. Co.*, No. C-13-00229-JCS, 2013 WL 6571629, at *7 (N.D.

United States District Court
Northern District of California

1    Cal. Aug. 19, 2013) (analyzing service under § 416.10 and observing that an LLC, including the

2    nonresident LLC in the lawsuit, can be served under § 416.40).

3        California law permits service by publication "if upon affidavit it appears to the satisfaction of

4    the court in which the action is pending that the party to be served cannot with reasonable

5    diligence be served in another manner" specified in Article 3 of the California Code of Civil

6    Procedure. Cal. Civ. Proc. Code § 415.50(a).

7        For Agile, Scott, and Martin, the plaintiffs effected proper service (as approved by the court)

8    through publication in the San Francisco Chronicle for four consecutive weeks.[65] The plaintiffs

9    also reattempted service by email.[66]

10       The plaintiffs personally served Dynamic through its agent, Ali Alam, and One Stop waived

11   any objection to sufficiency of service by not raising it in its answer.[67] Fed. R. Civ. P. 12(h)(1).

12       For VTLogo (a Florida corporation), the plaintiffs effected substitute service for defunct

13   corporations on the Florida secretary of state.[68]

14       With the court's approval, the plaintiffs served Khan by email and by personal service under

15   the Hague Convention.[69] Thus, the plaintiffs have served all defendants.

16       The order next addresses issues about the merits of the default-judgment motion.

17

18                                          **ANALYSIS**

19       Under Federal Rule of Civil Procedure 55(b)(2), a plaintiff may apply to the district court for

20   — and the court may grant — a default judgment against a defendant who failed to plead or

21   otherwise defend an action. After entry of default, well-pleaded allegations in the complaint

22   regarding liability and entry of default are taken as true, except as to damages. *Fair Hous. of Marin*

23

24   _____

[65] Mot. – ECF No. 95; Order – ECF No. 99; Serv. by Publ'n – ECF No. 109.

25
     [66] Simonovich Suppl. Decl. – ECF No. 190 at 2–3 (¶¶ 4–6).

26   [67] Certificates of Serv. – ECF Nos. 10–11; Answers – ECF Nos. 22, 44.

27   [68] Certificate of Serv. – ECF No. 47.

28   [69] Certificate of Serv. – ECF No. 159; Br. – ECF No. 167 at 31; Simonovich Decl. – ECF No. 196-1 at
     3 (¶¶ 1–3); Serv. Docs., Ex. A to Simonovich Decl. – ECF No. 196-1 at 4–13.

*United States District Court*
*Northern District of California*

1    v. Combs, 285 F.3d 899, 906 (9th Cir. 2002). The court need not make detailed findings of fact. *Id.*

2    "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the

3    pleadings." Fed. R. Civ. P. 54(c).

4        "A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment."

5    *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002). The decision to

6    grant or deny a default judgment lies within the court's discretion. *Draper v. Coombs*, 792 F.2d

7    915, 924–25 (9th Cir. 1986).

8        In deciding whether to enter a default judgment, the court considers seven factors: "(1) the

9    possibility of prejudice to the plaintiff; (2) the merits of [the] plaintiff's substantive claim; (3) the

10   sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a

11   dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the

12   strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."

13   *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). "Of all the *Eitel* factors, courts often

14   consider the second and third factors to be the most important." *Mohanna v. Bank of Am., N.A.*,

15   No. 16-cv-01033-HSG, 2017 WL 976015, at *3 (N.D. Cal. Mar. 14, 2017) (cleaned up).

16       The *Eitel* factors favor default judgment.

17

18   **1.   The Possibility of Prejudice to the Plaintiffs (First *Eitel* Factor)**

19       The first *Eitel* factor considers whether the plaintiffs would suffer prejudice if the court does

20   not enter default judgment, and whether such potential prejudice to it weighs in favor of granting a

21   default judgment. *Eitel*, 782 F.2d at 1471; *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d

22   1039, 1054 (N.D. Cal. 2010). Without a default judgment, the plaintiffs have no other remedy to

23   recover their lost funds.[70] This factor favors default judgment.

24

25

26

27

[70] Br. – ECF No. 167 at 19.

28

United States District Court
Northern District of California

1

2. **The Merits and Sufficiency of the Claims (Second and Third *Eitel* Factors)**

3       The second and third *Eitel* factors consider the merits of the claim and the sufficiency of the

4   complaint. *Eitel*, 782 F.2d at 1471. "The Ninth Circuit has suggested that [these factors] . . .

5   require that plaintiffs' allegations 'state a claim on which the [plaintiff] may recover.'" *Kloepping*

6   *v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996)

7   (quoting *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978)).

8   2.1    **Breach of Oral and Written Contracts (Claims 1 and 2)**

9       To recover damages under a breach of contract claim, the plaintiff must show (1) the plaintiff

10   and the defendants entered into a contract; (2) the plaintiff did all, or substantially all, of the

11   significant things that the contract required him to do; (3) the defendants failed to do something

12   that the contract required them to do; and (4) the plaintiff was harmed by that failure. *Acoustics,*

13   *Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971); *see First Com. Mort. Co. v. Reece*, 89

14   Cal. App. 4th 731, 745 (2001).

15       The plaintiffs pleaded all requirements: they entered oral and written agreements with the

16   defendants and paid for services that the defendants did not deliver, harming the plaintiffs.[71]

17   2.2    **Breach of Implied Covenant of Good Faith (Claim 3)**

18       The covenant of good faith and fair dealing is implied in every contract and, in most situations,

19   prevents one party from "unfairly frustrating the other party's right to receive the benefits" of the

20   contract. *See, e.g.*, *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000); *see Wolf v. Wells Fargo*

21   *Bank, N.A.*, No. C11–01337 WHA, 2011 WL 4831208, at *4 (N.D. Cal. Oct. 12, 2011) (citing

22   *McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 799 (2008)). The covenant is a

23   "supplement to an existing contract, and thus it does not require parties to negotiate in good faith

24   prior to any agreement." *Bulaoro v. Oro Real, Inc.*, No. C 11–03059 WHA, 2011 WL 6372458, at

25   *4 (N.D. Cal. Dec. 20, 2011) (cleaned up) (quoting *McClain*, 159 Cal. App. 4th at 799). The

26   covenant does not, however, "prohibit a party from doing that which is expressly permitted by an

27

*United States District Court*
*Northern District of California*

---

28   [71] FAC – ECF No. 100 at 16 (¶¶ 67–70).

1    agreement. On the contrary, as a general matter, implied terms should never be read to vary

2    express terms." *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992).

3        This factor supports default judgment. The defendants frustrated the purpose of the contracts by

4    converting the applications for their own designs.[72]

5    **2.3    Fraud (Claim 4)**

6        The first issue is whether the facts of this case subject the plaintiffs to the economic-loss rule,

7    barring their fraud claim. The claim is not barred.

8        "The economic-loss rule bars tort claims for losses arising out of a contract, where a failed

9    product has caused only economic loss, but has not injured anyone or damaged other property."

10    *Grouse River Outfitters Ltd. v. NetSuite, Inc.*, No. 16-cv-02954-LB, 2016 WL 5930273, at *11

11    (N.D. Cal. Oct. 12, 2016) (collecting and analyzing cases). Excepted from this rule are (among

12    other things) claims that a "contract was fraudulently induced." *Robinson Helicopter v. Dana Corp.*,

13    34 Cal. 4th 979, 989–90 (2004); *Frye v. Wine Libr., Inc.*, No. 06-5399 SC, 2006 WL 3500605, at *2

14    (N.D. Cal. Dec. 4, 2006) (citing *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999)); *see Grouse River*,

15    2016 WL 5930273, at *11 (conducting this analysis).

16        Here, the plaintiffs relied on the defendants' misrepresentations, exposing them to a loss that

17    exceeded their contract damages (given the limitation of liability). Thus, the economic-loss rule

18    does not bar the plaintiffs' claim because they did not assume the contract risk voluntarily.

19        The second issue is whether the plaintiffs have plausibly pleaded the elements for fraud: (1) a

20    material misrepresentation (or omission), (2) knowledge of falsity, (3) an intent to defraud, (4)

21    justifiable reliance, and (5) resulting damages. *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638 (1996).

22    The plaintiffs have pleaded fraud with the required particularity.

23        First, they have identified multiple misrepresentations by the defendants.

24        Statements constituting mere "puffery" cannot support liability for fraud or negligent

25    misrepresentation. *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal.

26    1999). "Puffery" has been described "as making generalized or exaggerated statements such that a

27

28    [72] *Id.* at 17–18 (¶¶ 71–74).

United States District Court
Northern District of California

reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *In re All Terrain Vehicle Litig.*, 771 F. Supp. 1057, 1061 (C.D. Cal. 1991) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 246 (9th Cir. 1990)). "[U]ltimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008). "[A]dvertising which merely states in general terms that one product is superior is not actionable." *Cook, Perkiss & Liehe*, 911 F.2d at 246 (quoting *Smith-Victor Corp. v. Sylvania Elec. Prods., Inc.*, 242 F. Supp. 302, 308 (N.D. Ill. 1965)). "However, misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (quoting *Stiffel Co. v. Westwood Lighting Grp.*, 658 F. Supp. 1103, 1115 (D.N.J. 1987)).

"[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud." *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal. App. 4th 153, 158 (1991). "Certain broken promises of future conduct may, however, be actionable." *Id.* "A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact.* The allegation of a *promise* (which implies a representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact." *Id.* at 158–59 (quoting 5 B. Witkin, Cal. Procedure at 120 (3d ed. 1985)). "To maintain an action for deceit based on a false promise, one must specifically allege and prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." *Id.*; *see Randell v. Levi Strauss & Co.*, No. C 05-1047 CW, 2006 WL 1310464, at *6 (N.D. Cal. May 12, 2006) ("Levi Strauss was a good company to work with, it was fair, [and] it was a place that [the plaintiff could] retire from" was a non-actionable opinion and statement about a future event).

Whether an alleged misrepresentation is a non-actionable statement of puffery is a question of law. *Cook, Perkiss & Liehe*, 911 F.2d at 246.

Here, the defendants told the plaintiffs that they would create an online store for Huntgem, promising a "100% Satisfaction Guarantee" and a "100% Money Back Guarantee" for the

1    services.[73] The plaintiffs paid $9,697 for the website, but the defendants did not give her control of

2    it and refused to return the payments when the plaintiffs demanded it.[74] Instead, the defendants

3    operated the Huntgem website themselves and, in one instance, received payment from the plaintiff

4    for an order but never delivered the goods.[75] These promises are actionable because they are factual

5    statements that the defendants would either produce a satisfactory website for the plaintiffs or

6    refund the payments, not a nonactionable opinion or puffery.

7        The plaintiffs also identified promises by the defendants to "transfer all files relating to

8    Huntgem and DreamOway" to a dedicated server, provide "complete access to the website's

9    administrative cPanel feature," and purchase and install "APIs and SDKs," none of which the

10   defendants performed.[76]

11       Second, the plaintiffs pleaded that the defendants knew their statements were false and intended

12   to defraud them. Their knowledge and intent are supported by the frequency of their broken

13   promises over two different products and the defendants' refusal to return control of the Dream App

14   unless the plaintiffs drop the case.[77]

15       Third, as shown by the series of payments the plaintiffs made to defendants, the plaintiffs

16   justifiably relied on the defendants' representations that they could and would provide services for

17   Huntgem and the Dream App (including developing websites and applications) and suffered

18   damages because of them.[78]

19   **2.4    Theft — California Penal Code § 496 (Claim 5)**

20   California Penal Code § 496(a) provides in relevant part:

21           Every person who buys or receives any property that has been stolen or that has been
22           obtained in any manner constituting theft or extortion, knowing the property to be so

23

24   _____

     [73] *Id.* at 7–8 (¶¶ 28–29).

25   [74] Sinclair Decl. – ECF No. 177 at 5; Emails, Ex. 6 to Mot. – ECF No. 168-1 at 32–33.

26   [75] FAC – ECF No. 100.

     [76] *Id.* at 13–14 (¶¶ 56–62).

27   [77] Br. – ECF No. 167 at 22–23; FAC – ECF No. 100 at 7–15 (¶¶ 26, 30, 33, 38, 43, 46, 50, 57, 60).

28   [78] Br. – ECF No. 167 at 22–23.

stolen or obtained . . . shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.

Section 496(c) has a treble damages provision for civil actions: "Any person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

California courts have held that "[s]ection 496(a) extends to property 'that has been obtained in any manner constituting theft.'" *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x 238, 242 (9th Cir. 2021) (cleaned up) (quoting *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1048 (2013)). California Penal Code § 484(a) defines theft: "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, . . . is guilty of theft." The elements of theft under § 484(a) are "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Grouse River*, 848 F. App'x at 242. If a plaintiff adequately pleads fraud in a case like this, "it follows that [it] adequately pleaded theft by false pretense (which satisfies the first element of a § 496 violation) because the elements of a civil fraud claim closely track those of theft by false pretense." *Id.*

As addressed above, the defendants obtained the plaintiffs' money, websites, and applications through fraud, knew the property belonged to the plaintiffs, and received the property.

### 2.5    Unfair Business Practices (Claim Six)

California's Unfair Competition Law (UCL) allows plaintiffs to bring claims for unfair, unlawful, or fraudulent business practices. Cal. Bus. & Prof. Code § 17200; *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 717 (9th Cir. 2012). Remedies under the statute are limited to injunctive relief and restitution. *Gutierrez*, 704 F.3d at 717.

The plaintiffs allege that the defendants' actions, including the repeated misrepresentations to induce plaintiffs to pay increasing sums of money so that defendants would deliver the promised

1  services, were unfair competition and unlawful, unfair, and fraudulent business practices under the

2  UCL.[79] The plaintiffs pleaded violations of each prong.

3      The "unlawful prong" of the UCL "incorporates other laws to make them actionable." *Jordan*

4  *v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1098 (N.D. Cal. 2010). "Generally, 'violation of almost

5  any law may serve as a basis for a UCL claim.'" *Id.* (quoting *Plascencia v. Lending 1st Mortg.*,

6  259 F.R.D. 437, 448 (N.D. Cal. 2009)).

7      To state a claim under the "fraud" prong of § 17200, a plaintiff must allege facts showing that

8  members of the public are likely to be deceived by the alleged fraudulent business practice. *See*

9  *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009).

10      The fraudulent business practice prong of the UCL has been understood to be distinct from
11   common law fraud. A [common law] fraudulent deception must be actually false, known to be
    false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of
12   these elements are required to state a claim for injunctive relief under the UCL. This
    distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's
13   damages, in service of the statute's larger purpose of protecting the general public against
14   unscrupulous business practices.

15  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting *In re Tobacco II*

16  *Cases*, 46 Cal. 4th 298, 312 (2009), *abrogated on other grounds by Jabbari v. Farmer*, 965 F.3d

17  1001 (9th Cir. 2020)).

18      A business practice can satisfy the "unfair prong" even if it is not unlawful. California courts

19  have defined an unfair business practice as one that "is immoral, unethical, oppressive,

20  unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of

21  the defendant's conduct against the gravity of the harm to the alleged victim." *See Drum v. San*

22  *Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (cleaned up).

23      As addressed above, the plaintiffs have pleaded that the defendants' business practices were

24  unlawful (by violating California Penal Code § 496(a)) and fraudulent.[80] For the same reasons, the

25

26

27  ───────────────
    [79] FAC – ECF No. 100 at 20–22 (¶¶ 90–95); Br. – ECF No. 167 at 24.

28  [80] Br. – ECF No. 167 at 23–24.

United States District Court
Northern District of California

1  defendants' conduct was also unfair. Thus, the plaintiffs pleaded all three prongs for unfair,

2  unlawful, and fraudulent business practices.

3  **2.6    Unjust Enrichment (Claim 7)**

4  The plaintiffs' restitution claim is redundant with their claims for breach of contract, fraud, and

5  theft. *Oracle Corp. v. SAP AG*, No. C 07-1658 PJH, 2008 WL 5234260, at *8 (N.D. Cal. Dec. 15,

6  2008) (citing *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 (2004) ("[R]estitution may be

7  awarded either (1) in lieu of breach of contract damages, where an asserted contract is found to be

8  unenforceable or ineffective, or (2) where the defendant obtained a benefit from the plaintiff by

9  fraud, duress, conversion, or similar conduct, but the plaintiff has chosen not to sue in tort.")).

10

11  **3.    The Sum of Money at Stake (Fourth *Eitel* Factor)**

12  The fourth *Eitel* factor considers the sum of money at stake in the action. Substantial or

13  unreasonable monetary demands weigh against default judgment. *Eitel*, 782 F.2d at 1472 (three-

14  million-dollar judgment, considered in light of the parties' dispute as to material facts, supported

15  decision to not enter default judgment); *Tragni v. Souther Elec. Inc.*, No. C 09-32 JF (RS), 2009

16  WL 3052635, at *5 (N.D. Cal. Sept. 22, 2009); *Bd. of Trs. v. RBS Wash. Blvd., LLC*, No. C 09-

17  00660 WHA, 2010 WL 145097, at *3 (N.D. Cal. Jan. 8, 2010). When the sum of money at stake is

18  tailored to the specific misconduct of the defendant, default judgment may be appropriate. *Bd. of*

19  *Trs. of the Sheet Metal Workers Health Care Plan of N. Cal. v. Superhall Mech., Inc.*, No. C-10-

20  2212 EMC, 2011 WL 2600898, at *2–3 (N.D. Cal. June 20, 2011) (the amount of unpaid

21  contributions, liquidated damages, and attorney's fees were appropriate because they were

22  supported by adequate evidence provided by the plaintiffs).

23  Here, the plaintiffs seek compensatory damages ($581,408.60), treble and punitive damages

24  ($1,744,225.80), attorney's fees ($186,099.61), and costs ($15,221.66).[81] While the amount of

25  compensatory damages the plaintiffs seek is significant, they have supported their claim by

26

27

---

28  [81] *Id.* at 26–31.

United States District Court
Northern District of California

1    declaration and documentary support.[82] For treble damages, California Penal Code § 496(c)

2    authorizes it, and the defendants' conduct falls under the statute. The plaintiffs' request is also not

3    so exorbitant as to run afoul of the due process clause. *See State Farm Mut. Auto. Ins. Co. v.*

4    *Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between

5    punitive and compensatory damages . . . will satisfy due process."); *S. Union Co. v. Irvin*, 563 F.3d

6    788, 792 (9th Cir. 2009) ("[W]here the constitutional limit lies with respect to punitive damages

7    will vary from case to case. Determining that limit is an art, not a science; no mathematical

8    formula controls; no single asymptote defines the limit for all cases."); *Bennett v. Am. Med.*

9    *Response, Inc.*, 226 F. App'x 725, 728–29 (9th Cir. 2007) (determining that a punitive damages

10   award of $649,000 on top of $100,000 in compensatory damages (a ratio of 6.49:1) was excessive

11   and remanding for the district court to consider punitive damages not exceeding a 4:1 ratio). To the

12   extent that the plaintiffs request punitive damages on top of trebled damages, this would be

13   redundant. As discussed below, the attorney's fees and costs are reasonable. Therefore, this factor

14   weighs in favor of default judgment.

15

16   **4.   The Possibility of a Dispute or Excusable Neglect (Fifth and Sixth *Eitel* Factors)**

17       The fifth and sixth *Eitel* factors consider the possibility of a dispute concerning material facts

18   and whether a defendant's failure to respond was likely due to excusable neglect. Material facts are

19   not in dispute: the court takes the well-pleaded allegations in the complaint as true. *Combs*, 285

20   F.3d at 906. There is no excusable neglect: the plaintiffs served the defendants properly, Dynamics

21   and One Stop answered the complaint before defaulting, and Scott and Martin have communicated

22   with the plaintiff about the lawsuit.[83] This factor weighs in favor of default judgment. *See, e.g.*,

23   *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001) ("The

24   default . . . cannot be attributed to excusable neglect. All were properly served with the Complaint,

25   the notice of entry of default, as well as the papers in support of the instant motion.").

26

27   _____

     [82] FAC – ECF No. 100; Br. – ECF No. 167.

28   [83] *See* Statement.

**5.    The Strong Policy Favoring Decisions on the Merits (Seventh *Eitel* Factor)**

The seventh *Eitel* factor considers the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. Although default judgment is disfavored, "[t]he very fact that [Rule] 55(b) exists shows that this preference, standing alone, is not dispositive." *Kloepping*, 1996 WL 75314, at *3. "While the Federal Rules do favor decisions on the merits, they also frequently permit termination of cases before the court reaches the merits[,] . . . [as] when a party fails to defend against an action[.]" *Id.* Litigation on the merits does not appear possible. This factor weighs in favor of default judgment.

*            *            *

In sum, the *Eitel* factors favor default judgment.

**6.    Relief Sought**

The final issue is whether the plaintiffs have proved the damages they seek and provided the defendants with proper notice.

Under Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). The purpose of this rule is to ensure that a defendant is put on notice of the damages being sought against him so that he may make a calculated decision about whether it is in his best interest to answer. *In re Ferrell*, 539 F.3d 1186, 1192–93 (9th Cir. 2008) (rejecting requests for damages and fees because the prayer for relief lacked the "requisite specificity to put defendants on notice that the [plaintiff] sought attorneys' fees and costs on the default judgment"); *Bd. of Trs. of the Sheet Metal Workers Local 104 Health Care Plan v. Total Air Balance Co., Inc.*, No. 08-2038 SC, 2009 WL 1704677, at *4 (N.D. Cal. June 17, 2009) (defaulting defendant's due-process rights were not violated "because the defendant had been served with all of the papers justifying the pension fund's request and leading up to the final determination").

"To recover damages after securing a default judgment, a plaintiff must prove the relief it seeks through testimony or written affidavit." *Bd. of Trs. of the Laborers Health & Welfare Tr. Fund for N. Cal. v. A&B Bldg. Maint. Co. Inc.*, No. C 13-00731 WHA, 2013 WL 5693728, at *4

(N.D. Cal. Oct. 17, 2013); *see Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2011 WL

3267714, at *2 (N.D. Cal. July 29, 2011) (requires admissible evidence, including witness

testimony); *Bd. of Trs. of Bay Area Roofers Health & Welfare Tr. Fund v. Westech Roofing*, 42 F.

Supp. 3d 1220, 1232 n.13 (N.D. Cal. 2014) (the plaintiff has the burden to establish damages).

The complaint provides fair notice of the compensatory damages, treble damages, and

attorney's fees and costs. Because the equitable relief sought by the plaintiffs overlaps with the

compensatory damages, the court does not address it.[84]

### 6.1    Compensatory Damages

The plaintiffs request two categories of compensatory damages: (1) the amount they paid the

defendants for the undelivered services and (2) the cost of developing the Dream App source code

that the defendants retain. For undelivered services, the damages chart lists $91,140.75 in

damages: (1) $9,697 for payments made to the defendants by plaintiff Sinclair, (2) $52,221.75 for

payments made by DreamOway, and (3) $29,222 for payments made by the plaintiffs collectively

for hosting and payment integration.

All payments are supported by invoices and receipts. While the complaint does not list the

$16,200 payment for payment integration or $10,000 DreamOway paid on November 14, 2022, the

FAC lists similar payments that provide sufficient notice to the defendants for the requested

$91,140.75.[85] *Cf. Airdoctor, LLC v. Xiamen Qichuang Trade Co.*, 134 F.4th 552, 555 (9th Cir.

2025) (reversing the denial of compensatory damages where the complaint requested damages for

breach of contract "the amount of which was to be proved at trial").

Similarly, the plaintiffs' pleading that the defendants held their products "hostage" throughout

the FAC and request for compensatory damages sufficiently noticed the defendants that the

plaintiffs sought damages for replacing the Dream App. There were two minor discrepancies

between the plaintiffs' damages chart and supporting documents: the damages chart lists (1)

---

[84] Suppl. Br. – ECF No. 196 at 2.

[85] FAC – ECF No. 100 at 7–15 (¶¶ 24–62). The plaintiffs provided notice for the $4,200 payment and the $8,822 payment for the hosting and payment integration services, but there is no statement about the $16,200 payment for additional payment integration services. *Id.* at 13–15 (¶¶ 56–62).

United States District Court
Northern District of California

1   $48,794.79 paid to BUILTbybacksapce from June 2019 to August 2022 when the invoices add to

2   $47,376.46 and (2) $4,984.14 paid to Aws.Amazon when the invoices total $4,983.64. After these

3   adjustments, the plaintiffs proved damages of $490,267.85 to replace the Dream App. Thus, the

4   total compensatory damages the plaintiffs proved for payments made to the defendants and

5   replacing the Dream App are $581,408.60.

6   **6.2    Treble and Punitive Damages**

7   The plaintiffs pleaded that the defendants violated California Penal Code § 496(a), which

8   allows them treble damages under California Penal Code § 496(c). Treble damages for the adjusted

9   compensatory damages above is $1,744,225.80. To the extent that the plaintiffs seek punitive

10  damages in addition to treble damages, further penalties are unnecessary for deterrence.

11  **6.3    Attorney's Fees and Costs**

12  The plaintiffs have been represented by different counsel throughout the litigation: L&F Brown,

13  P.C., from June 2023 to February 2024, Joyce Ma of Cohen Law Group from June 2023 through

14  December 2024, and Jacqueline Simonovich of Weintraub Tobin from December 2024 until now.

15  The plaintiffs' counsels were not operating on a contingency basis.[86] The plaintiffs have established

16  entitlement to costs of $15,221.66 and attorney's fees of $186,099.61.[87]

17  The court applies the lodestar approach, which the court calculates by multiplying the number

18  of hours reasonably spent by counsel by a reasonable hourly rate. *Chavez v. City of Los Angeles*,

19  47 Cal. 4th 970, 985 (2010). "The lodestar is the basic fee for comparable legal services in the

20  community." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) (cleaned up). "The reasonable

21  hourly rate is that prevailing in the community for similar work." *PLCM Grp. v. Drexler*, 22 Cal.

22  4th 1084, 1095 (2000). The court may adjust the lodestar based on several factors. *Ketchum*, 24

23  Cal. 4th at 1132. "The purpose of such adjustment is to fix a fee at the fair market value for the

24  particular action. In effect, the court determines, retrospectively, whether the litigation involved a

25

26

---

[86] Simonovich Suppl. Decl. – ECF No. 190 at 2 (¶ 3); Ma Decl. – ECF No. 190-1 at 2 (¶ 3).

[87] Br. – ECF No. 167 at 30–31.

United States District Court
Northern District of California

1   contingent risk or required extraordinary legal skill justifying augmentation of the unadorned

2   lodestar in order to approximate the fair market rate for such services." *Id.* (cleaned up).

3        Here, the plaintiffs' attorneys submitted declarations supporting the reasonableness of their

4   hourly rates, which ranged between $420 and $600.[88] Based on the court's own experience with

5   fee applications, the court is satisfied that the rates are consistent with prevailing rates in the

6   community by comparable lawyers doing similar work. *See Cuviello v. Feld Entertainment, Inc.*,

7   No. 13-cv-04951-BLF, 2015 WL 154197, at *2–3 (N.D. Cal. Jan 12, 2015) (court has broad

8   discretion in setting the reasonable hourly rates used in the lodestar calculation); *Ketchum*, 24 Cal.

9   4th at 1132 (court can rely on its own experience).

10       The hours worked are also reasonable. The applicant must justify the claim by submitting

11  detailed time records. *Hensley v. Eckhart*, 461 U.S. 424, 437 (1983) (The applicant "is not

12  required to record in great detail how each minute of his time was expended" but should "identify

13  the general subject matter of his time expenditures"); *Smith v. Payne*, No. C 12-01732 DMR, 2013

14  WL 1615850, at *1 (N.D. Cal. Apr. 15, 2013) (citations omitted). The applicant must exercise

15  sound "billing judgment" regarding the number of hours worked and must eliminate excessive,

16  redundant, unproductive, or unnecessary hours. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

17       Here, the attorneys submitted detailed time records showing the time billed on the case.[89] The

18  case required the plaintiffs' counsels to identify and locate the defendants (who used false

19  identities in their fraudulent schemes), attempt to obtain written discovery and take depositions of

20  the defendants who appeared, serve the defendants, and participate in mediation and settlements

21  with the dismissed defendants. The tasks and hours billed by the attorneys (273.2 hours through

22  December 2024 and 108.7 since then) and the costs were reasonable based on the defendants'

[88] Wang Decl. – ECF No. 174 at 3 (¶ 13); Simonovich Suppl. Decl. – ECF No. 190 at 2 (¶ 2); Ma Decl. – ECF No. 190-1 at 2 (¶ 2).

[89] Billings Rs. – ECF Nos. 189-4–6.

1    resistance to participating in the case.[90] The court recommends awarding attorneys' fees in the

2    amount of $186,099.61 and costs of $15,221.66.

3

4                                              **CONCLUSION**

5         The court recommends default judgment of $2,526,955.67: $581,408.60 in compensatory

6    damages, $1,744,225.80 in treble damages, $186,099.61 in attorney's fees, and $15,221.66 in

7    costs. Any party may file objections to this report and recommendation with the district judge

8    within fourteen days after being served with a copy. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);

9    Civil L.R. 72. Failure to file an objection may waive the right to review the issue in the district

10   court.

11       **IT IS SO ORDERED.**

12       Dated: June 3, 2025

13                                                    _____

14                                                    LAUREL BEELER
                                                      United States Magistrate Judge

_____

[90] Ma. Decl. – ECF No. 175 at 4 (¶ 15); Simonovich Decl. – ECF No. 172 at 2 (¶ 3); Simonovich
Suppl. Decl. – ECF No. 190 at 3 (¶ 9).

United States District Court
Northern District of California